[Crim. No. 20860. Second Dist., Div. Five. July 21, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN JOHN ORR, Defendant and Appellant.

**COUNSEL**

Norman A. Chernin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Frederick R. Millar, Jr., Robert W. Carney and John R. Evans, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**AISO, J.**—By information defendant Steven John Orr was charged with burglary (Pen. Code, § 459). His motion to suppress real and testimonial evidence under Penal Code section 1538.5 was heard, argued, and denied. He thereupon duly waived a jury trial and stipulated to submission of his case on the transcript of the preliminary examination (*In re Mosley* (1970) 1 Cal.3d 913 [83 Cal.Rptr. 809, 464 P.2d 473], cert. den. 400 U.S. 905 [27 L.Ed.2d 142, 91 S.Ct. 144]). Found guilty of burglary of the second degree, he was committed to the Youth Authority upon his waiving presentence probation report and requesting immediate commitment to the Youth Authority from which he was on parole. He appeals from the judgment (order of commitment to Youth Authority) (Welf. & Inst. Code, § 1737.5) seeking a review of the order denying his section 1538.5 motion (*People* v. *Fein* (1971) 4 Cal.3d 747, 750 [94 Cal.Rptr. 607, 484 P.2d 583]).

On May 26, 1971, the premises occupied by William Brown, Richard Jones, and James Turner at 182220 Pacific Coast Highway were burglarized. Following his arrest, defendant confessed to the burglary and voluntarily assisted the officers in recovering some of the stolen items from his bedroom and the garage of his parents' home where he lived. He contends before us, as he did in the trial court, that all of the real evidence and confession introduced against him should have been suppressed as the tainted product flowing from an illegal arrest, which resulted from an arresting officer illegally looking into a blue metal box under the circumstances set forth below.[1] The People deny the claim of illegality. They assert that in any event the illegality, if any, did not contaminate the other real evidence and confession supportive of the conviction and that the judgment therefore should be affirmed.

We have concluded there was no improper search and seizure and that the judgment should be sustained.

The blue "metallic-appearing" box with "sort of an orangeish-yellow circular central design in it" and characterized variously by the witnesses as a "cash box," "safe-deposit box" and a "strongbox," was one of the items stolen in the burglary. It belonged to James Turner who kept his bills, tax returns, and other papers in it.

The evidence adduced at the section 1538.5 hearing is summarized in

---

[1] Several other related contentions of error are advanced by defendant, but they are not dispositive of this appeal.

the light most favorable to the trial court's findings in light of the decisional authorities, which will be discussed more fully later.

On June 10, 1971, about 6 p.m. when it was starting to get dark, Officers Earl Lesley Johnson and William Charles Violante, of the Los Angeles Police Department, assigned to Devonshire Station patrol duties, were westbound in a vehicle on Nordhoff Street at the intersection of Zelzah Avenue in Northridge. They were in uniform and their vehicle was a marked black and white police car. Officer Violante was driving and Officer Johnson was a passenger.

The campus of San Fernando Valley State College (now California State University at Northridge) lies on the north side of Nordhoff commencing from the west side of Zelzah. Both officers testified that the police had had "lots of problems" due to the high frequency of burglaries from the motor vehicles parked in that area. On the south side of Nordhoff, a cement block wall[2] 5 to 6 feet high runs parallel to the southerly curb of Nordhoff extending from Zelzah on the east to Lindley Avenue on the west, walling in the tract houses located south of the wall. Enfield Avenue (on which defendant lived) is the first north-south street west of Zelzah and ends in a cul-de-sac in the general area of concern in this case. There were oleander bushes 6 to 7 feet high growing on the south side of the wall. A dirt path or walkway ran east-west between the wall and Nordhoff. There was a post and rail fence about 3 to 3½ feet high, which ran perpendicular from the wall to the cul-de-sac, separating defendant's yard from his neighbor's.

Just as his vehicle passed Zelzah, Officer Johnson saw defendant standing on the dirt walkway on the south side of Nordhoff approximately 50 to 100 yards west of Zelzah.[3] Defendant was 2 to 3 feet away from the wall, facing north towards the college, and with his back towards the wall. Officer Johnson's attention was drawn by what he characterized as "furtive movements" of the defendant, who was carrying a suitcase and looking up and down, i.e., east and west, Nordhoff. At least during half of the time defendant was looking east and west, he was looking in the direction of the police vehicle. When the police car was 30 to 40 yards away to the east or northeast of defendant, he made a half-turn and threw the suitcase which he had in his hand over the wall. About 20 feet west of defendant, there was a vehicle with another person in it; its passenger door was open. The officer knew that there was a street ending in a cul-de-sac on

---

[2] At times called a "brick wall" by the witnesses.

[3] The position of defendant at this moment is marked with an "X Deft" on Exhibit A, which would be west of the post and rail fence and across the wall from his neighbor's property, on the dirt walkway.

the other side of the wall in the general area where defendant's actions were observed. Defendant turned and walked back towards the parked car as the police vehicle made a U-turn and stopped behind it.

Numerous thoughts occurred to Officer Johnson upon observing defendant's actions. "One was possible burglary from motor vehicle. Another one, possibly the defendant was throwing the suitcase over to possibly another suspect on the other side of the wall to enter one of these residences here [*sic*], using it as a container to take fruits of a crime out of these residences, or it was the fruits of a crime he was disposing of."

Officer Johnson left his vehicle as soon as it had halted, telling his partner to take care of the two occupants of the vehicle parked ahead of them. He proceeded forthwith to the wall, scaled it, and dropped himself on the other side of it. He was unable to see over the wall. There were bushes taller than his head on the other side. Landing on the other side, he saw and retrieved from a dirt area, without any grass or bushes growing on it, the suitcase and a metal box previously described.

The suitcase, about 4 by 2 feet, was closed. The metal box, "approximately twelve by six" (inches), was lying about 3 feet from the suitcase and 6 to 8 feet from the wall. He pointed out with "an X" (*sic*) (see fn. 4, *infra*) the respective locations of the suitcase and box on the diagram (Exhibit A) apparently in response to an inquiry by the trial court.[4] The box had a dial indicator for a combination locking device and a hasp with which to close it. The box was not locked and the hasp was loose; however, it was not open in the sense of permitting a look at its contents. On the outside of the box, there "appeared to be three to four pry marks made by approximately a half-inch bladed screwdriver." Officer Johnson opened the top of the unlocked box, looked inside, and noted that it contained numerous bills, receipts, and miscellaneous papers in the name of James Turner with a Pacific Coast Highway, Malibu, address. He was not aware of any specific burglary at the time. He took possession of the suitcase and metal box and climbed back over the wall. He then asked defendant and

---

[4]A double "XX" appearing to be made with the same black colored crayon as "X Deft" is shown on Exhibit A. These are shown west of the post and rail fence and on the portion of the neighbor's yard depicted in the diagram. It is inferable from the testimony on pages 22-23 of the reporter's transcript and the trial judge's comment on page 70 thereof that the "XX" is the location which Officer Johnson called to the court's attention. "THE COURT: Have you placed the area where it [metal box] was found? [PROSECUTOR]: Will you mark an X approximately where the— THE COURT: So far I haven't seen where it was found. THE WITNESS: Approximately the *suitcase here with the strongbox here, sir.* THE COURT: All right." On page 70: "THE COURT: Does it make any difference if, in fact, the suitcase was thrown onto other property other than the defendant's home? [DEFENSE COUNSEL]: I don't think so. . . . "

the other party with defendant if either was named James Turner. Upon their negative response, he placed both of them under arrest upon suspicion of burglary. He had not been in contact with defendant until he came back from his excursion over the wall. He had no search warrant when he looked into the box.

Officer Violante also saw defendant when he was about 100 yards away. He observed defendant standing near the "brick wall" looking to his right and to his left and then throw a suitcase over the wall. While his partner officer went over the wall, he talked to defendant and the driver of the parked vehicle. He asked defendant what he was doing and defendant replied that he was throwing his suitcase onto the other side of the wall, that he lived there. He asked defendant for some identification. In response, defendant displayed a selective service card, but Officer Violante could not remember seeing an address on it. Defendant possibly displayed a library card at the same time. About this time, Officer Johnson returned carrying the suitcase and blue metal box. He noted the condition of the metal box indicating that it had been pried open. He looked inside and saw miscellaneous papers in the name of James Turner. He confirmed the arrest of the two suspects after his partner asked if either of them was James Turner and received a negative answer.

Defendant testified in part here relevant: At the time in question he did reside with his parents at 9046 Enfield Avenue located on the east half of the cul-de-sac. There is another yard located on the west half of the cul-de-sac.

He did not throw the suitcase; he just lifted the suitcase over the wall and let it drop on the other side onto his own property. Although his testimony concerning the oleanders accords in general with the testimony of the officers, he stated that rather than oleanders there were roses about waist high growing where he dropped the suitcase. There is a break in the line of oleanders in the area of the post and rail fence where there are roses. He had returned to Jerome Kushner's car to pick up the remaining property he had left on the back seat. Later on defendant stated: "The radio was inside the car with the leather French coat I had on."

He told Officer Violante that he was just returning from a trip, that Kushner had picked him up when he was "thumbing a ride." Since Kushner lived in Van Nuys, he thought it would be easier for Kushner to have Kushner drop him off where he could climb the wall into his backyard and go through the back door rather than have Kushner go around the block to get to the front of the house.

The trial court inquired of defendant, "Did you throw a green [*sic*] box over the wall?" Defendant replied, "No, sir, just the suitcase." The court asked, "That green [*sic*] box didn't belong to you at all nor did you throw it over; is that it?" Defendant answered, "Yes, sir." As to this portion of defendant's testimony, his own trial counsel commented in course of his argument to the trial court: "I don't think the defendant was telling the truth about how the box got there. The evidence on its merits would bear that out."

Based upon the foregoing evidence the trial court made the following findings: He accepted as true Officer Johnson's testimony that he saw defendant, with the suitcase in his hand, looking up and down the street apparently in the direction of the marked police automobile and then throw the suitcase over a wall. The area had a high incidence of "automobile burglaries"[5] being particularly opposite Valley State College. After advising his partner to cover the two (defendant and Kushner), "he then vaults over the wall; he sees the suitcase apparently which is of the same kind that he observed the defendant throwing, together with a box; [¶] Examining the box without opening it, he sees pry marks on there, as if it had been pried open, . . . and the lock was not intact. [¶] He then opens it up, examines the contents and sees some papers in the name of a James Turner. [¶] Still without arresting the defendant, he goes back over the wall and asks whether either one of them is named Turner, and neither one of them was. [¶] At this point the defendant is arrested."

The trial court's conclusions may be summarized by these quotations: "[T]he conduct of the officer was not unreasonable, because no one would suppose that somebody would throw—not knowing that defendant lived there—at that point to throw a suitcase over the wall in these circumstances, without conducting some further investigation." "Under [these] circumstances I think that Officer Johnson had the right to make the examination or the inspection of the contents of the strongbox and that under the circumstances he had reasonable cause for doing so."

■ We agree with the foregoing findings and conclusions of the trial court. ■ The resolution of conflicts in the testimony given at a section 1538.5 hearing is for the trial court which is the judge of the credibility of witnesses. (*People* v. *West* (1970) 3 Cal.3d 595, 602 [91 Cal.Rptr. 385, 477 P.2d 409].) Where conclusions in such a hearing turn upon issues of fact and credibility of witnesses, the appellate court does not reweigh the

---

[5]The precise meaning of this phrase is not clear from the record. We interpret it to mean theft from parked unlocked vehicles as well as the breaking into of vehicles which are locked, with the intent to commit a larceny. (Pen. Code, § 459.)

evidence. (*People* v. *Harrington* (1970) 2 Cal.3d 991, 997 [88 Cal.Rptr. 161, 471 P.2d 961], cert. den. 402 U.S. 923 [28 L.Ed.2d 662, 91 S.Ct. 1384].) ■ Where the trial court has found probable cause for a warrantless arrest or the reasonableness of a search the appellate court will set aside such findings only if there is no substantial evidence in support. (*People* v. *Levy* (1971) 16 Cal.App.3d 327, 333 [94 Cal.Rptr. 25]; *People* v. *Superior Court (Mahle, Jr.)* (1970) 3 Cal.App.3d 476, 488 [83 Cal.Rptr. 771].) ■ The credibility of the defendant was fatally, if not completely, destroyed by his testimony that he never possessed the box and that he did not throw it over the wall—a statement which his own trial counsel refused to buy. ■ As to the quantum of proof, the trial court in a section 1538.5 hearing need only be convinced that the officer's version is more probably true. (*People* v. *Superior Court (Bowman)* (1971) 18 Cal.App.3d 316 [95 Cal.Rptr. 757].)

As to the merits of defendant's appeal, the pivotal issue is whether Officers Johnson and Violante had reasonable cause to detain defendant for an investigation, as distinguished from the arrest which came later, and whether Officer Johnson was justified in looking into the metal box without either defendant's permission or a search warrant. In the normal course, investigation is the process by which the police acquire the probable cause to justify the arrest and prosecution of one suspected of having committed a crime. (See Barrett, *Personal Rights, Property Rights, and the Fourth Amendment,* 1960 S.Ct. Rev. 46, 57.)

■ The Fourth Amendment provides in part which is here pertinent: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." "Of course, the specific content and incidents of this right must be shaped by the context in which it is asserted. For 'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.' *Elkins* v. *United States,* 364 U.S. 206, 222 (1960)." (*Terry* v. *Ohio* (1968) 392 U.S. 1, 9 [20 L.Ed.2d 889, 899, 88 S.Ct. 1868, 1873].) The exclusionary rule "cannot properly be invoked to exclude the products of legitimate police investigative techniques on the ground that much conduct which is closely similar involves unwarranted intrusions upon constitutional protections." (*Terry* v. *Ohio, supra,* 392 U.S. at p. 13 [20 L.Ed.2d at p. 901, 88 S.Ct. at p. 1875].) ■ Bottomed upon the community's interest in "law enforcement" (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 452 [30 Cal.Rptr. 18, 380 P.2d 658]) or "effective crime prevention and detection," "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable

cause to make an arrest." (*Terry* v. *Ohio, supra,* 392 U.S. at p. 22 [20 L.Ed.2d at pp. 906-907, 88 S.Ct. at p. 1880].) (See also *People* v. *Mickelson, supra.*)

■ Whether an officer has probable cause to search is to be tested by the facts as known to the officer at the time he acts. (*People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 821 [91 Cal.Rptr. 729, 478 P.2d 449]; *Terry* v. *Ohio, supra,* 392 U.S. at pp. 21-22 [20 L.Ed.2d at p. 906, 88 S.Ct. at p. 1880]; cf. *People* v. *Talley* (1967) 65 Cal.2d 830, 835 [56 Cal.Rptr. 492, 423 P.2d 564] (arrest).) Matters known to the officer's colleague, but not communicated to him at that time are excluded from consideration in determining the reasonableness of his actions. (*Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 485-487 [29 L.Ed.2d 564, 594-595, 91 S.Ct. 2022, 2048]; *People* v. *Rhodes* (1971) 21 Cal.App.3d 10, 19 [98 Cal.Rptr. 249].)

It is also to be remembered that we do not deal here with a search of either a house or of a person. Both the suitcase and the box were lying on open ground, and technical trespasses, if any, are no longer considered dispositive of the reasonableness issue of a search or seizure. (E.g., *People* v. *Terry* (1969) 70 Cal.2d 410, 427 [77 Cal.Rptr. 460, 454 P.2d 36], cert. den. 399 U.S. 911 [26 L.Ed.2d 566, 90 S.Ct. 2205]; *People* v. *Maltz* (1971) 14 Cal.App.3d 381, 394-395 [92 Cal.Rptr. 216].)

■ An investigation may not be carried out on a "mere hunch," but where there is a "rational suspicion" that some activity out of the ordinary is going on, an officer has a duty to investigate and the mere fact that the activity is compatible with innocence does not alone make a detention and investigation unlawful. (*People* v. *Superior Court (Acosta)* (1971) 20 Cal.App.3d 1085, 1091 [98 Cal.Rptr. 161]; cf. *Terry* v. *Ohio, supra,* 392 U.S. at pp. 29-30 [20 L.Ed.2d at pp. 910-911, 88 S.Ct. at p. 1884].)

Much has been made of "furtive movements" in connection with the search of motor vehicles in such cases as *People* v. *Superior Court (Kiefer) supra,* 3 Cal.3d 807, but that case did not rule out furtive movements altogether as a factor in determining probable cause. Justice Mosk, author of the *Kiefer* opinion stated in *Gallik* v. *Superior Court* (1971) 5 Cal.3d 855, 859 [97 Cal.Rptr. 693, 489 P.2d 573]: "The guiding principle of *Kiefer* is that to constitute probable cause for an arrest or search, a 'furtive gesture' such as a motorist's act of bending over inside his car must be invested with guilty significance either by specific information known to the officer or by additional suspicious circumstances observed by him."

■ Thus, where the ambient circumstances known to the officer or observed by him are such as to give a probably guilty significance to the "furtive movement," a search may be made without a warrant. (*People* v. *Blodgett* (1956) 46 Cal.2d 114, 117 [293 P.2d 57].)

It has also been stated that " '[t]he test of "probable cause" required by the Fourth Amendment can take into account the nature of the search that is being sought.' " (*Camara* v. *Municipal Court* (1967) 387 U.S. 523, 538 [18 L.Ed.2d 930, 941, 87 S.Ct. 1727, 1735].)

■ Applying the foregoing rules of law to the facts established at the section 1538.5 hearing, there can be little cavil that Officer Johnson had reasonable cause to scale the wall and to look for the suitcase which he saw defendant throw. The area was one in which there was a high incidence of burglaries from cars parked in the vicinity of the college campus. The wall was high enough to prevent the officer from seeing what was on the other side; oleander bushes, higher than the wall itself, were growing on the other side of the wall. He knew that there was a street coming north which ended in a cul-de-sac in the proximity of the place where defendant threw the suitcase. He did not know that defendant lived on the easterly portion of the cul-de-sac. The information which Officer Violante developed while Officer Johnson was on the other side of the wall is not to be attributed to Officer Johnson in judging whether Officer Johnson's search was reasonable. Defendant had looked furtively up and down Nordhoff Street, looking part of that time towards a marked police vehicle approximately 100 yards away. Reason would dictate that if his main concern was to see that his suitcase would land in his back yard in an area where neither his suitcase nor the roses would get damaged, defendant would have been facing the wall instead of having his back to it and facing northerly towards the college away from the wall. Then came the act of the suitcase being thrown over the wall. Certainly, under these circumstances, the officer would have been derelict if he did not investigate. One possibility, as he testified, was that there might be a confederate on the other side of the wall to catch the suitcase as it was thrown.

As soon as Officer Johnson was over the wall and had made his way out of the bushes (oleanders), he found in plain sight upon open ground not only the suitcase but the metal box, about 12 by 6 inches in size and of a type that one normally uses to keep his cash, jewels, or valuable documents in, only about 3 feet away from the suitcase. Exterior examination disclosed that it had a combination dial for a locking device but that the box was not locked, and the hasp used for closing it was loose. Additionally there were visible pry marks indicating that it might have been pried open forcibly.

Citing *People* v. *Marshall* (1968) 69 Cal.2d 51 [69 Cal.Rptr. 585, 442 P.2d 665], defendant contends that Officer Johnson should have asked either for defendant's-permission to look into the box or a search warrant authorizing him to do so. We do not agree. We do not deal with a search of a home (especially its closets) nor with a paper bag innocent upon its outside appearance. That an article is "contraband" or stolen may be determined by its shape, design, or weight and the manner in which it is carried. (*Henry* v. *United States* (1959) 361 U.S. 98, 104 [4 L.Ed.2d 134, 139, 80 S.Ct. 168, 172] (dictum).) By way of analogizing stolen property to contraband, we note that it has been held that narcotics wrapped up in a handkerchief thrown by a suspect upon the approach of police officers is an abandonment of the handkerchief and its contents and that they were legally acquired by the police. (*People* v. *Harris* (1971) 15 Cal.App.3d 498, 501 [93 Cal.Rptr. 285]; accord *People* v. *Poehner* (1971) 16 Cal. App.3d 481, 485, 486, 488 [94 Cal.Rptr. 94].) It has also been held that an officer may look inside an article where the article from external indicia is itself contraband. (*People* v. *Nickles* (1970) 9 Cal.App.3d 986, 992-993, 994 [88 Cal.Rptr. 763].) It was inferable that defendant had also thrown the metal box over the fence to dispossess himself of it. It was 6 to 8 feet away from the wall. The visible pry marks indicated its possible stolen character. Stolen property, such as a checkbook, abandoned in flight at the sight of police officers, was impliedly held subject to examination in *People* v. *Siegenthaler* (1972) 7 Cal.3d 465 [103 Cal.Rptr. 243, 499 P.2d 499]. The officer's looking inside to ascertain the ownership of the stolen metal strongbox in this case was not unreasonable. It was neither an intrusion into defendant's right of privacy nor an unjustifiable intrusion of that of the rightful owner.

This was not a wholesale search conducted under color of governmental authority condemned by *Kiefer, supra,* 3 Cal.3d. at pp. 813-814, and the scope of the search was strictly tied to and limited to the scope justified by the circumstances rendering its initiation permissible. "[T]here is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' *Camara* v. *Municipal Court,* 387 U.S. 523, 534-535, 536-537 (1967)." (*Terry* v. *Ohio, supra,* 392 U.S. at p. 21 [20 L.Ed.2d at pp. 905-906, 88 S.Ct. at pp. 1879-1880].)

Ascertainment of the ownership of the metal box was urgent in both protecting the interests of law enforcement and minimizing the detention of the defendant. If his papers were in the box, then they together with the explanations given by defendant to Officer Violante would have dispelled the right to further detain defendant. In this connection, the rationale

applied by the court in *Chambers* v. *Maroney* (1970) 399 U.S. 42, 52 [26 L.Ed.2d 419, 428, 90 S.Ct. 1975, 1981] is also applicable here, although the object of the search in *Chambers* was an automobile rather than a metal box. (*People* v. *Superior Court (Evans)* (1970) 11 Cal. App.3d 887, 893 [90 Cal.Rptr. 123].) The court in *Chambers* stated: "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." There was probable cause here to search. The alternative course of obtaining a search warrant would have involved detaining the two suspects for a considerable period of time, since it is not always easy in Los Angeles to contact a magistrate after 6 p.m. in the evening. On the other hand, if a look inside the box had dispelled the suspicion that it was stolen property then the period of detention for investigative purposes would have been minimized as we have earlier stated. Probable cause for the arrest developed when both suspects denied being James Turner, whose name and Malibu address were on the papers in the box.

The arrest being legal and an appropriate *Miranda* warning having been given prior to defendant's voluntary cooperation in locating other property stolen in the burglary and his confessing of the burglary, we find it unnecessary to discuss the other points raised in defendant's brief.

The judgment (commitment to the California Youth Authority) is affirmed.

Kaus, P. J., and Stephens, J., concurred.