302 So.2d 869 (1974)
STATE of Louisiana
v.
Charlene M. SAIA.
No. 54856.
Supreme Court of Louisiana.
October 11, 1974.
Dissenting Opinion November 12, 1974.
Rehearing Denied November 27, 1974.
George S. Hesni, Milton P. Masinter, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Louise Korns, Asst. Dist. Atty., for plaintiff-appellee.
*870 DIXON, Justice.
On August 18, 1972 Patrolmen Arnold Jackson and Paul Eskine were driving by the residence at 619 General Taylor Street, New Orleans, in their marked police car when they noticed the defendant leaving that residence. The officers knew that this address was an outlet for drugs;[1] however, they did not recognize the defendant. The defendant, Charlene Saia, proceeded down General Taylor until the police car pulled up beside her at which time she put her hand inside the waistband of her pants and turned around and walked back toward 619 General Taylor. The officers, concluding that defendant had secreted contraband drugs in her pants, got out of their car and followed her back toward 619 General Taylor. They overtook her from the rear in front of the door to 619 General Taylor. They testified that she again reached into the waistband of her pants and then brought her hand toward her head. Officer Jackson testified that he observed what he thought to be a glassine envelope containing heroin in her hand. The officers grabbed the defendant's hand and removed two glassine envelopes filled with a white powder which was later tested and shown to be heroin. The defendant was arrested and charged with violating R.S. 40:966. Defendant filed a motion to quash and a motion to suppress, both of which were denied by the trial court. On January 24, 1973 trial was held and the jury returned a verdict of guilty. During the proceedings sixteen bills of exceptions were reserved.
Bills of Exceptions Nos. 3, 4, 6, 7, 8, 9 and 11
These bills concern testimony given during the motion to suppress hearing and at the trial by the police officers involved in the case. Bill No. 4 was reserved when the trial judge denied the motion to suppress. For the following reasons we hold that the motion to suppress should have been granted.
Street encounters are an everyday occurrence on today's urban streets. See, LaFave, Street Encounters and the Constitution, 67 Mich.L.Rev. 39 (1968). The police, however, are bound by the Constitution of the United States to leave the public "secure in their persons, houses, papers, and effects." It must be stressed that this Fourth Amendment protection is not to be read in a vacuum. This amendment is only one of the cornerstones of what has come to be called the "right to privacy." Historically, the Fourth Amendment has never been restricted to its terms. In the case of Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, 751 (1886), the court noted the scope and purpose of the right to privacy:
"The principles laid down in this opinion (by Lord Camden in Entick v. Carrington, 19 How St Tr 1029) affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, ... it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment." (Emphasis added).
Mr. Justice Brandeis, drawing from the above explanation of the purpose of the Fourth Amendment further expounded on the meaning of the Bill of Rights in his dissenting opinion in the case of Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. *871 564, 572, 72 L.Ed. 944 (1928) (one of the early wiretap cases):
"The makers of our Constitution undertook to secure conditions favorable to the pursuit for happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alonethe most comprehensive of rights and the right most valued by civilized men. To protect, that right, every unjustifiable intrusion by the government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. And the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth." (Emphasis added).
In this case we are faced with the conflict of the policeman's duty to investigate crime and the citizen's right to, as Justice Brandeis stated, "be let alone."
The State argues that the police had probable cause to arrest the defendant when the officers saw the glassine envelope in her hand. This is correct. However, the police had acted before they saw the envelope. In oral argument on this question the State sought to justify these prior actions of the police officers by Article 215.1 of the Code of Criminal Procedure. Although this statute certainly deals with street encounter situations, the statute must be read beside the Fourth Amendment of the United States Constitution and Article I Section 7 of the Louisiana Constitution of 1921, for if the police actions violate these constitutional protections it cannot be seriously argued that the statute can justify the actions. These prior actions must first be tested against the Fourth Amendment.
In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court recognized and upheld, for the first time, an intrusion by a police officer based on something less than probable cause. In a concurring opinion, Mr. Justice Harlan, although agreeing with the resolution of the case, was disappointed in the approach taken by the court. The court had emphasized the reasonableness of the frisk and its necessity for the protection of the officer. Mr. Justice Harlan felt that the primary issue, and one demanding resolution before any of the other problems could be reached, was whether the officer was constitutionally allowed to make a forcible stop of the suspect. Mr. Justice Harlan stated:
"If the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection he must first have a right not to avoid him but to be in his presence. That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection. I would make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a forcible stop to investigate a suspected crime." 392 U.S. 1, 32-33, 88 S.Ct. 1868, 1885, 20 L.Ed.2d 889 (emphasis in original).
Justice Harlan's approach to this problem has now been accepted and is the law of this country. The Supreme Court used this approach in Adams v. Williams, 407 *872 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), holding that the police officer did have grounds to make a forcible stop on the basis of an informer's tip. Numerous decisions of the federal appellate court show an almost universal application of this approach to the analysis of the legality of a street encounter. See, United States v. Brown, 457 F.2d 731 (1st Cir. 1972); United States v. Fields, 458 F.2d 1194 (3rd Cir. 1972); Dodd v. Beto, 435 F.2d 868 (5th Cir. 1970); United States v. Catalano, 450 F.2d 985 (7th Cir. 1971); Field v. Swenson, 459 F.2d 1064 (8th Cir. 1972); United States v. Mallides, 473 F.2d 859 (9th Cir. 1973); United States v. Mallory, 460 F.2d 243 (10th Cir. 1972); Young v. United States, 140 U.S.App.D.C. 333, 435 F.2d 405 (1970).
If the seizure is unjustified, any evidence seized, even if voluntarily produced, must be excluded. In United States v. Ward, 488 F.2d 162 (9th Cir. 1973), the court held that the FBI had illegally stopped the defendant in his vehicle. When asked to identify himself the suspect presented a false Selective Service card and was arrested immediately for this offense. The court held that the evidence had to be suppressed because the illegal "seizure" tainted all of the subsequently acquired evidence.
We must, therefore, approach this case by determining first whether the officers in this instance had sufficient knowledge to justify an investigatory stop. Terry v. Ohio, supra, stands for the proposition that a stop of this nature may be made on less than "probable cause." How much less is the question.
Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), was decided along with Terry v. Ohio, supra, and handed down the same day. In Sibron the police officer had observed the suspect for approximately eight hours as the suspect approached numerous known drug addicts and held conversations with the addicts. The officer did not see anything pass between the suspect and the addicts nor did he overhear any of the conversations. Although the majority based the decision on not only the seizure but the scope of the search, the court found that the seizure was unjustified. The Chief Justice, writing for the court, stated:
"The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security." 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917.
Justice Harlan, analyzing the case with the approach now used by the court concluded:
"The forcible encounter between Officer Martin and Sibron did not meet the Terry reasonableness standard. In the first place, although association with known criminals may, I think, properly be a factor contributing to the suspiciousness of circumstances, it does not, entirely by itself, create suspicion adequate to support a stop. There must be something at least in the activities of the person being observed or in his surroundings that affirmatively suggests particular criminal activity, completed, current or intended. That was the case in Terry, but it palpably was not the case here. ...
"... in Terry, the police officer judged that his suspect was about to commit a violent crime and that he had to assert himself in order to prevent it. Here there was no reason for Officer Martin to think that an incipient crime, of flight, or the destruction of evidence would occur if he stayed his hand; indeed, there was no more reason for him to intrude upon Sibron at the moment when he did than there had been four hours earlier, and no reason to think the situation would have changed four hours later. While no hard-and-fast rule can be drawn, I would suggest that one important factor, missing here, that should *873 to be taken into account in determining whether there are reasonable grounds for a forcible intrusion is whether there is any need for immediate action."
If the officer in the Sibron case did not have sufficient evidence to allow an investigatory stop after seeing the suspect confer with various known narcotic addicts for eight hours then the officers in this case cannot be said to have had sufficient grounds to stop the defendant because they saw her exit from a residence which they knew as a drug outlet.
Upon oral argument of this case the State urged, apparently for the first time, that Article 215.1 of the Code of Criminal Procedure authorized the officers to stop and question the suspect in this case. In Sibron, it was noted that New York had a stop and frisk statute which was obviously the forerunner of Article 215.1. The court pointed out that, although a state may create its own law on search and seizure, these laws must always be tested against the Fourth Amendment. Thus, unless the specific seizure in question can be upheld as reasonable under the Fourth Amendment, the state statute can have no effect. If the state legislature attempts to validate a seizure that is invalid under the Fourth Amendment, then the statute by which the attempt is made must be unconstitutional. Thus, we simply note that although there are, no doubt, instances where Article 215.1 may be applied and constitutionally upheld, it cannot be applied in this case because of the conflict with the Fourth Amendment to the United States Constitution.
The seizure in the instant case occurred when the police officers sprang from their car and overtook the defendant in front of 619 General Taylor. As Justice Harlan noted in his concurring opinion in Terry v. Ohio, supra, the officer must first have the right not to avoid the person under suspicion but rather to approach him and by so doing intrude into the person's freedom of movement. The police cannot approach citizens under circumstances that make it seem that some form of detention is imminent unless they have probable cause to arrest the individual or reasonable grounds to detain the individual under Terry v. Ohio, supra. Police officers cannot actively create "street encounters" unless they have knowledge of suspicious facts and circumstances sufficient to allow them to infringe on the suspect's right to be free from governmental interference. United States v. Ward, supra.
In summary, the facts before us indicate that the police attempted to seize the defendant without probable cause and without sufficient evidence to justify the seizure under Terry v. Ohio, supra, and Adams v. Williams, supra. The "right to be let alone," as Justice Brandeis phrased it, is of the utmost importance in a free society. The police cannot interfere with this right unless specifically authorized by a judicial officer or under narrowly drawn exceptions to the warrant requirement of the Fourth Amendment. Since the police action in this case was unlawful, any evidence which was seized as a result of this action is inadmissible under Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).
The conviction and sentence are set aside, and the case is remanded for further proceedings not inconsistent with this opinion.
SANDERS, C. J., and SUMMERS and MARCUS, JJ., dissented and assigned written reasons.
SANDERS, Chief Justice (dissenting).
The Fourth Amendment to the United States Constitution prohibits only unreasonable searches and seizures. The courts have long recognized that a warrantless search of a person incident to a lawful arrest does no violence to the constitutional guarantee. Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963);
*874 Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); James v. Louisiana, 382 U.S. 36, 86 S.Ct. 151, 15 L.Ed.2d 30 (1965); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).
The sole issue in the present case, then, is whether the police officers here had probable cause to make a warrantless arrest. The trial judge, who heard the witnesses, found that they had probable cause. I agree.
In State v. Wood, 262 La. 259, 263 So.2d 28 (1972), we set forth the applicable law, as follows:
"[P]robable cause for a warrantless arrest exists when the facts and circumstances known to the arresting officer and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. State v. Dell, 258 La. 1024, 249 So.2d 118 (1971); State v. Johnson, 249 La. 950, 192 So.2d 135 (1966), cert. den. 388 U.S. 923, 87 S.Ct. 2144, 18 L.Ed.2d 1374.
"The arrest must stand on firmer ground than mere suspicion. The arresting officer, however, need not have sufficient evidence to convict. In testing probable cause, a court takes into account the total atmosphere of the case. United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); 5 Am.Jur.2d, Arrest § 44, p. 735; Fisher, Laws of Arrest, § 78, pp. 168-171 (1967)."
The record discloses the following pertinent facts: The police officer had received information from other officers and reliable informants that 619 General Taylor Street was an outlet for narcotics. Defendant was seen by this officer coming out of the house at this address. When the officer, with another, followed her in their police vehicle, she turned and walked toward the house. The officers got out of their car and followed her. The officer then observed defendant remove from her waistband what appeared to be a glassine envelope, which she attempted to place in her mouth. At this point, the police grabbed her and informed her that she was under arrest. She struggled momentarily, but the officer succeeded in opening her fingers and removing two glassine envelopes containing heroin.
In my opinion, the officer's observation of defendant's evasive action, his observation of the glassine envelope, and his prior information about the drug outlet constituted probable cause to make the arrest. To a person of ordinary caution, the total atmosphere evidenced criminal activity.
I know of no constitutional principle, as announced in the majority opinion, which requires law enforcement officers to have probable cause for arrest before approaching, or walking toward, a person on the streets. Such a pronouncement represents an unwarranted extension of constitutional doctrine, and, if applied, will greatly handicap law enforcement.
For the reasons assigned, I respectfully dissent.
MARCUS, Justice (dissenting).
I disagree with the majority. I consider the facts of this case clearly show that the police had probable cause to conduct the search and make the seizure. The officer had information from other officers and other reliable informants that 619 General Taylor Street was an outlet for drug traffic. Defendant was seen by this officer coming out of the house at this address. When the officer, with another, followed alongside her in the police vehicle, she turned and commenced walking back toward 619 General Taylor. The officers got out of their car and followed her. Defendant was then observed by the officer taking from her waistband what appeared to be a glassine envelope which she attempted to place in her mouth. It was at this point that she was grabbed and informed that she was under arrest. She *875 struggled temporarily, but the officer was successful in opening her fingers and removing two glassine envelopes containing heroin.
The activities of the defendant in relation to the information that the address involved was an outlet for drugs was sufficient to justify the instant search and seizure. The facts affirmatively suggest criminal activity. I find no violation of the fourth amendment. Accordingly, I respectfully dissent.
SUMMERS, Justice (dissenting).
As I understand the facts of this case, on August 18, 1972 about 3:05 in the afternoon Officers Jackson and Eskine were on the lookout for narcotic violators frequenting the residence at 619 General Taylor Street in the city of New Orleans. They had received information from other police officers and reliable informers that the building was an outlet for illicit drug traffic. While they drove slowly along the street toward the residence, defendant was observed emerging from the building. As she walked away from the building, they pulled alongside her. When they did so, she placed her right hand into the waistband of her trousers, turned sharply around and walked back toward 619 General Taylor. Although the officers saw no object in her hand at the time, the gesture was furtive and was an obvious attempt to secrete something in her trouser waistband.
Because of the defendant's reaction to their presence, and because of the knowledge previously acquired by the police that 619 General Taylor was an outlet for narcotics, Jackson and Eskine concluded that she had probably "tried to conceal contraband in her waistband". They further believed that she was attempting to take refuge from the police by returning to the drug outlet from which she had just emerged. They therefore alighted from the police vehicle and sought to overtake defendant before she could enter the building. As they approached her, she looked at them over her right shoulder, placed her hand again at her waistband and made a motion toward her mouth "as if to place whatever she had in her mouth." At this time Officer Jackson recognized a white object in her hand to be a glassine envelope, which she was trying to swallow. He grabbed her hand, and as she struggled he opened her fingers and removed two glassine envelopes which later analysis disclosed contained heroin. During this confrontation Officer Jackson advised her that she was under arrest.
Jackson was familiar with the fact that those trafficking in heroin used glassine envelopes. He had made many arrests in which persons possessing heroin attempted to dispose of it by swallowing while they were being arrested. As a member of the Public Tactical Unit he had made at least a hundred narcotic arrests. His background enabled him to recognize the defendant's actions for what they werefurtive efforts to dispose of the evidence and escape arrest. Her action fell into the pattern adopted by narcotic violators.
This recitation of the facts is not basically different from the factual narrative in the majority opinion, but this version does disclose a fundamental difference. Aside from highlighting the sequence of events, the significant difference pertains to the special knowledge, experience and training which enabled these officers to recognize this defendant as a narcotic violator. Though subtle, the failure of the majority to note this fact is critical. Under these same circumstances others less qualified would not have been warranted in making this arrest and seizurethese officers were; a contrary view is entirely unrealistic.
Her presence at the narcotic outlet, her furtive gesture, her hasty effort to retreat from the scene, all gave adequate reasonable and probable cause to the lawmen that this defendant very probably had narcotics in her possession. When they observed her effort to swallow the heroin thereafter, *876 there was adequate reasonable and probable cause to make the arrest and seizure. The heroin was then in plain view.
By a specific legislative authorization
"A. A law enforcement officer may stop any person in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or a misdemeanor and may demand of him his name, address and an explanation of his actions.
"B. When a law enforcement officer has stopped a person for questioning pursuant to this Article, and reasonably suspects that he is in danger of life or limb, he may search the outer clothing of such person for a dangerous weapon or for any other thing the possession of which may constitute a crime.
"C. If the law enforcement officer finds a dangerous weapon or any other thing the possession of which may constitute a crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person." La.Code Crim.Proc. Art. 215.1
This authority should suffice to justify the police action in this case. However, this decision, which receives approval by such a narrow margin in this Court, has such a potential for deterring legitimate police activity in the very difficult and unique realm of dangerous drug control, that I feel compelled to point out the error of the majority's reliance upon authorities which do not support their position.
Although I believe no "stop" occurred here, if by a strained interpretation of the facts, driving up to the defendant could be considered as such, I cannot subscribe to the proposition that the traditional test of probable cause is applicable to investigatory "stops" as the majority holds. To begin with, the consequences of an arrest are not involved when a person is merely approached for inquiry, a temporary detention is not a "seizure" in the constitutional sense. United States v. Vita, 294 F.2d 524 (2d Cir. 1961); United States v. Bufalino, 285 F.2d 408 (2d Cir. 1960); United States v. Bonanno, 180 F.Supp. 71 (S.D.N.Y.1960).
Moreover, if this approach by the police to the defendant in the police vehicle on a public street could be considered as a "stop", in the sense in which that term is used, it is a lesser "seizure" than, and distinguishable from, an arrest; therefore, a less stringent standard than the traditional test of probable cause should be required. Such a brief detention is not as serious a restriction as an arrest where the individual taken into custody is subjected to an extensive search of his person, booked, fingerprinted and often incarcerated. Logic requires, and the concept of reasonableness explicit in the Fourth Amendment contemplates, that a distinction be made between an arrest and an investigatory detention. Comment, 29 La.L.Rev. 523, 524 (1969).
Conceding that "the police had probable cause to arrest the defendant when the officers saw the glassine in her hand," the majority nevertheless maintains the motion to suppress the evidence. The ruling is on the tenuous grounds that the police had no reason for getting out of their car and approaching the defendant to pursue their investigation by questioning her under the authority granted by Article 215.1 of the Code of Criminal Procedure. Reliance is placed upon the concurring opinion of Mr. Justice Harlan in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and the decisions in Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); and Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).
The cases are readily distinguishable on their facts, or, if carefully analyzed, they more properly support the reasonableness of the arrest and seizure in the record before us. As already noted, I cannot subscribe to the finding that a stop occurred here by merely driving alongside the defendant. She was neither compelled to stop nor to turn back to the drug outlet by *877 the action of the police. To turn and flee simply because she saw the police car approaching is not due to police action. This conduct, instead, is a spontaneous manifestation of guilt.
In my view to stop occurred until the officers actually laid hands upon the defendant and detained her, announcing that she was arrested. And it must be recalled that this did not occur until the glassine envelope was in plain view and the defendant was engaged in a frantic attempt to swallow the incriminating evidence. Until this occurred, the defendant had not been stopped. Before she was stopped she resorted to devices the officer recognized as the customary attempts of narcotic users to avoid arrest and to destroy or conceal the evidence.
Assuming for the sake of argument, however, that a "stop" did occur, I believe the majority will concede, as do all authorities, that a "stop" is a temporary detention of an individual being investigated. Thus in Terry v. Ohio, supra, Detective McFadden approached three suspicious looking men whose actions indicated that they may be "casing" a retail establishment. Each approached the building and looked closely through the shop window at the inside. Then they would assemble at a nearby corner and confer. This occurred 24 times. His suspicions aroused, Detective McFadden identified himself and asked their names. When he received no coherent reply, he grabbed Terry, spun him around, and patted down the outside of his clothing. Feeling a pistol in Terry's overcoat pocket, he removed Terry's overcoat and took a revolver from the left breast pocket. Although the court found that probable cause for the arrest of Terry did not exist, it held that the detective had sufficient ground to stop and detain Terry briefly for questioning upon suspicion that he might have been engaged in criminal activity, and also to pat down his outer clothing and weapons. Of course, it could be argued with as much validity as the result in the majority opinion that these men were window shopping.
In the instant case, no invasion of defendant's privacy resulted when the officers drove up alongside her and then alighted from their car to question her. The actual detention, or invasion of privacy, took place when the defendant displayed the glassine envelope. Jackson and Eskine did not stop the defendant until legal grounds for her arrest were established. In Terry v. Ohio the detention was not as well supported.
In Sibron v. New York, supra, a New York police officer watched Sibron during an eight-hour period and saw him in conversation with known drug addicts. Later the officers saw Sibron in a restaurant with three more known addicts. He ordered Sibron outside and said, "You know what I'm after." When Sibron reached into his pocket, the officer reached into the same pocket and found envelopes containing heroin.
The Court held that the officer did not have the right to search Sibron's pockets simply because he had seen Sibron in the company of other addicts. And, moreover, there were no adequate grounds for a search of Sibron for weapons since the officer had no reason to believe that Sibron was armed and dangerous. The Court further noted that even if, arguably, there had been justification, there was no initial limited exploration for arms before the officer thrust his hand into Sibron's pocket (unlike the patting down in Terry).
In Sibron, a search actually took place simultaneously with the stop, which occurred when the officers ordered Sibron to step outside the restaurant. It is important to understand that it was not the officer's surveillance of Sibron, nor the officer's request to Sibron to step outside the restaurant (the "stop") which the United States Supreme Court disapproved. Rather, the "search" of Sibron's pockets at the time of the "stop" was found to be unreasonable. *878 Unlike Sibron, no search of the defendant's person ever took place in the case at bar until the narcotic was seen in defendant's hand. Sibron does not support the majority view.
The case of Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), is not authority for this decision. To the contrary, there, acting on an informer's tip, a police officer tapped on the window of Williams' parked car and asked Williams to open the door. When Williams rolled down the window instead, the sergeant reached into the car and removed a fully loaded revolver from Williams' waistband. Although the gun had not been visible to the officer from outside the car, it was precisely at the place indicated by the officer's informant. The Court held that the seizure of the pistol was constitutional under Terry v. Ohio, although at that time probable cause for arrest did not exist. The stop took place when the officer asked Williams to open the car door, the seizure when the gun was taken from Williams waistband.
No intrusion on the defendant's privacy took place in the case at bar until the glassine envelope was exposed at which time the seizure was made.
A case arising out of the famous "Appalachian Affair" in New York is pertinent here. Gangsters from all over the country were conducting a summit meeting at the estate of one Barbara. Barbara had been under investigation for various offenses. Local police, alerted by the unusually large number of cars around the place, set up a road block and check point on a nearby public road where they stopped all cars leaving the Barbara place. It was the intention of the police to stop these cars to find out, if possible, what was going on. Those stopped were taken to the police station and questioned for thirty minutes. At a trial thereafter, the defendant, who had been stopped and interrogated, moved to suppress the evidence obtained in this manner. The trial judge denied the motion. In view of the suspicious circumstances he held that law enforcement agents had the right reasonably and temporarily to stop and question the persons leaving Barbara's estate. See United States v. Bonanno, 180 F.Supp. 71 (S.D.N.Y.1960); cited with approval in Busby v. United States, 296 F.2d 328 (9th Cir. 1961).
Also relevant here, but not referred to by the majority, is Peters v. New York, 392 U.S. 40, 66, 88 S.Ct. 1912, 20 L.Ed.2d 917 (1968), the companion case to Sibron v. New York. In that case, a New York City officer, while at home in his sixth-floor apartment, heard strange noises outside his door which led him to believe someone was trying to force an entry into a nearby apartment. Upon investigating, he saw two men whom he had never seen in the building in his twelve years of residency. They were tiptoeing furtively about the hallway. When the officer entered the hallway, the two men quickly started down the stair. He chased them and collared Peters, who claimed to be in the building visiting his girl friend, but refused to identify her. The officer patted down Peters and removed an object from his pocket which turned out to be burglary tools.
The Supreme Court held that by the time the officer caught up with Peters on the stair between the fourth and fifth floors, he had probable cause to arrest him for attempted burglary. The search of Peters was found to be reasonable under the Fourth Amendment. This statement, which I consider especially relevant to the case at bar, was approved by the Court:
"... deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered *879 in the decision to make an arrest."
The Court cited the following authorities to support the quoted statement: Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Husty v. United States, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629 (1931); see also Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134, (1959). I would add the following: People v. Orr, 26 Cal.App.3d 849, 103 Cal.Rptr. 266 (1972); Gallik v. Superior Court of Santa Clara County, 5 Cal.3d 855, 97 Cal.Rptr. 693, 489 P.2d 573 (1971); People v. One Chevrolet Impala, 219 Cal.App.2d 18, 33 Cal.Rptr. 64 (1963).
In many respects the Peters Case is factually similar to the case at bar. In both, the officers became suspicious because of the unusual behavior of the suspect and followed him, and in each instance the action of the suspect gave the police reasonable cause for a warrantless arrest by the time hands were laid on.
We have heretofore adopted the rationale of these decisions in State v. Winesberry, 256 La. 523, 237 So.2d 364 (1970) and State v. Williams, 262 La. 317, 263 So.2d 306 (1972). It is injudicious to depart from those precedents now. Evidence of guilt should not be lightly cast aside because of the manner in which it was obtained unless the case falls unmistakeably within the exclusionary rule mandated by the Supreme Court. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).
At best the exclusionary rule rests upon a tenuous basis. It should not be invoked in a doubtful case. Almost from the day the exclusionary rule was created by the Supreme Court, it has been the subject of much criticism. This criticism has not been leveled at the objective of the rulenamely the protection of constitutional rights through deterrence of illegal police activitybut at its stated justifications and the illogical results created by its application. "The criminal is to go free," as Justice Cardoza said, "because the constable has blundered." Is it not more consistent with our judicial philosophy, it is argued, to punish both, each in proportion to his transgression, rather than to allow both to go untouched by the law? Professor Wigmore has criticized the rule with these oft quoted words:
"Titus, you have been found guilty of conducting a lottery; Flavius, you have confessedly violated the Constitution. Titus ought to suffer imprisonment for his crime, and Flavius for contempt. But no! We shall let you both go free. We shall not punish Flavius directly, but shall do so by reversing Titus' conviction. This is our way of teaching people like Flavius to behave, and incidentally of securing respect for the Constitution. Our way of upholding the Constitution is not by striking at the man who breaks it, but to let off somebody else who broke something else." Wigmore, Evidence (3d ed. 1940) 2184; cited in Elkins v. United States at 364 U.S. [206] 217 [80 S.Ct. 1437, 4 L.Ed.2d 1669]. See Miller, The Exclusionary Rule and Its Alternatives, 1974 Conference on the Judiciary, p. 40.
There is no empirical evidence to support the justification for the rule. It has not served to deter police misconduct. It should be plain to all, therefore, that the result of the rule is to make societythe ultimate victimsuffer from the crimes the rule helps to excuse and proliferate.
I respectfully dissent.
NOTES
[1] It is unclear how they obtained this information, although it is clear that they did not obtain it from personal observation.