526 So.2d 1346 (1988)
STATE of Louisiana
v.
Jose I. CUEVAS.
No. 88-KA-8.
Court of Appeal of Louisiana, Fifth Circuit.
May 16, 1988.
Harry E. Forst, New Orleans, for defendant-appellant.
*1347 Dorothy A. Pendergast, Asst. Dist. Atty., Twenty-Fourth Judicial District, Gretna, for plaintiff-appellee.
Before BOWES, GAUDIN, and GRISBAUM, JJ.
GRISBAUM, Judge.
This matter relates to a conviction of possession of marijuanafirst offense (La.R.S. 40:966). Although this matter has been lodged as an appeal, since the maximum sentence cannot exceed six months, this Court does not have appellate jurisdiction. See La.C.Cr.P. arts. 912.1, 779. However, under La.C.Cr.P. art. 912.1, we will treat the appeal as an application for supervisory writs and rule on the merits. We reverse and set aside.
ISSUE
The principal issue raised in brief is whether the trial court erred in not suppressing the evidence (seized marijuana). Raised on this Court's own motion is whether error patent exists.
PROCEDURAL HISTORY
The defendant, Jose Cuevas, was charged by bill of information with violation of La.R.S. 40:966, possession of a controlled dangerous substance, to-wit: marijuana; he was arraigned on July 6, 1984, at which time he entered a plea of not guilty. On June 24, 1985, the court heard the defendant's motion to suppress the evidence. Following the testimony, the court denied the motion. On the same day, the defendant went to trial and was found guilty as charged and sentenced to six months in the Jefferson Parish Correctional Center.
FACTS
Testifying at the motion to suppress, Narcotic Detective Raymond Gibbs stated that, on May 3, 1984 at about 1 p.m., he noticed the defendant around the 1800 block of Tensas Avenue in Harvey. He and another detective were observing for narcotics violations. Both were dressed in plain clothes; Gibbs was driving an unmarked blue Chevy Malibu. Gibbs has made hundreds of narcotics arrests and has previously observed subjects engaging in narcotics transactions. As to what transpired, Gibbs testifies as follows:
A. At approximately 1:00 PM while we were checking that particular area, Utte and Tensus [i.e., Tensas], we observed Mr. Cuevas in a red Pontiac, a small Pontiac. He had pulled up to the curb in the 1100 block on Tensus. At that time a group of subjects that were standing on the sidewalk approached the passenger side of the window of Mr. Cuevas' vehicle or the vehicle that he was riding in and they appeared to have been engaged in some type of conversation and transaction.
Q. More specifically, Officer, what did you observe take place between Mr. Cuevas and those individuals?
A. It appeared that there were hands passing through the window. And we couldn't actually see what was passing hands, but the hands were sticking from one side of the window to the other, back and forth from the passenger [i.e., the driver, Cuevas] to the people on the sidewalk.
Q. Now this particular area that you were in at the time, you indicated that it had a particular name known to you?
A. It's known as Electric Avenue.
Q. Now have you made arrest[s] for drug transactions in that area before?
A. Numerous times.
Q. Is that area known to you to be an area where transactions frequently take place, drug transactions?
MR. FORST [District Attorney]:
Judge, again ... Well[,] I'll withdraw that.
Go ahead.
A. Yes, it is.
MR. ZENO [Defense Counsel]:
Q. After you saw these hands passing through the window as you indicated, what did you do, sir?
A. After observing this for a few minutes, weI pulled my vehicle in front of the defendant's vehicle. At which time the subjects on the sidewalk or the subjects that were by the passenger door started walking back towards the sidewalk as if they were walking *1348 away. Detective Soutullo at this time approached the subjects on the sidewalk. And I exited my vehicle. And I observed that the defendant attempted to back up, but he was blocked by another vehicle behind him. At this time he stepped out of his vehicle and he dropped a small cellophane wrapper to the ground near the driver's door where he was standing.
I approached him, identified myself. I retrieved the small cellophane wrapper. And upon opening it and examining it, I noticed it contained a small amount of green vegetable material. I then conducted a preliminary field test on a small portion of the vegetable material, which proved positive for the presence of marijuana.
Q. Now Officer, this cellophane wrapper you made reference to, was it the kind that you could see the contents from the outside without having to first open it?
A. Yes, you could.
Q. All right. And have you in your four (4) years of working narcotics ever observed marijuana before in similar containers?
A. Yes.
Q. To the best of your knowledge, is that a common method of wrapping marijuana based upon what you observed?
A. It's one way that they seal marijuana and other small pills.
Gibbs opines that the defendant had seen Gibbs and his partner before the defendant attempted to move his vehicle. Gibbs was about 100 feet from the Cuevas vehicle when he observed the encounter. Nothing blocked Gibbs' view. After the field test indicated that the substance in the cellophane was marijuana, Gibbs advised Cuevas he was under arrest and advised him of his Miranda rights. Cuevas pleaded with Gibbs not to arrest him, saying he had just been released on probation. In response to Gibbs' asking where the marijuana came from, Cuevas said he had found it about a week previous.
Gibbs reports that he offered no inducements and made no threats to the defendant. He knows of no promises made to the defendant. On cross-examination, Gibbs clarifies that he was the driver of the unmarked police vehicle. He watched the defendant through the Malibu's windshield. Cuevas remained on the driver's side of his vehicle, being approached on the passenger side by the persons from the sidewalk. Cuevas "appeared to be leaning over talking through the passenger side window to the subjects and taking some kind of hand transaction through the window." Gibbs admits he could not tell whether the defendant was shaking hands with the third parties. Gibbs saw no cellophane or wrappers or anything change hands.
After observing what he did, Gibbs drove his car to the front of Cuevas' vehicle, blocking it. Gibbs and his partner then got out, prompting Cuevas to start backing up. At that point, another police vehicle pulled up and blocked Cuevas from the rear. (Gibbs says the second police vehicle was in the area; he does not know if it was so stopped purposely to block Cuevas.) "No one told him [the defendant] he couldn't leave," Gibbs adds, apparently discounting the plight of the defendant's vehicle. Cuevas exited his car after both police vehicles were in position.
When, after being surrounded, Cuevas exited his car, the cellophane bag containing the marijuana fell to the pavement by the driver's door, coming to rest near the defendant's feet. Gibbs says he did not order the defendant to exit his vehicle. The marijuana was wrapped in a clear cellophane wrapper, apparently off a cigarette pack, and was perhaps less than one-half inch wide. When he picked the packet up, Gibbs thought it looked like marijuana. He did not see Cuevas drop the packet but did see it fall to the ground. Gibbs was about five feet away when the defendant exited his car.
On redirect, Gibbs says no one else was near the defendant on that side of the car. He does not know where the cellophane packet fell from; the defendant's car door *1349 blocked Gibbs' view of part of Cuevas' body.
On direct examination at trial, Gibbs says he can "somewhat" recognize marijuana upon sight inspection. On cross-examination, Gibbs denies that he found the cellophane packet in the defendant's car. Gibbs had never before met the defendant. As to just where the cellophane packet came from, Gibbs reiterates, "I can only state that when he [Cuevas] stepped out of the vehicle that the cellophane envelope fell to the ground." It was in "very close proximity" to the defendant.
The defendant's account of the transaction is that he had dropped off a hitchhiker and then paused to say hi to some friends. He says he was told to get out of his car. The police then searched both him and the car. He considers the contraband must have been found during the course of the car search. He says the marijuana is not his.
LAW
This Court, in State v. Lee, 485 So.2d 555, 556 (La.App. 5th Cir.1986), succinctly stated our standard of review as follows:
[T]he circumstances under which a police officer may stop a person for questioning are both constitutionally and statutorily constrained. Louisiana Code of Criminal Procedure article 215.1 is a distillation of the constitutional jurisprudence which holds that:
The right to make an investigatory stop and question the particular individual detained must be based upon reasonable cause to believe that he has been, is, or is about to be engaged in criminal conduct.

State v. Chopin, 372 So.2d 1222, 1224 (La.1979). Reasonable cause amounts to something less than probable cause and
must be determined under the facts of each case by whether the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference.

State v. Chopin, supra. Absent reasonable cause bestowing the right to make an investigatory stop, "property abandoned or otherwise disposed of as a result thereof cannot be legally seized" by police. State v. Chopin, supra. (emphasis in Chopin is added here, not reproduced from Lee.)
In assessing what constitutes "reasonable cause" for an investigatory stop concerning similar factual scenarios, we are aided by recent jurisprudence in State v. Jones, 483 So.2d 1207, 1208-09 (La.App. 4th Cir.1986), writ denied, 488 So.2d 197 (La.1986) which held that police patrolling in a high crime area, particularly noted for narcotics traffic, who observed at about 6 p.m. two men, one of whom exchanged cash for an object, possess reasonable cause to stop the men, at least where the men appeared very nervous prior to seeing the officers and began walking away in opposite directions after spotting them. Likewise, State v. Garrett, 480 So.2d 412, 413-14 (La.App. 4th Cir.1985), conviction affirmed and sentence amended, 484 So.2d 662 (La.1986), found that officers who were patrolling in an unmarked police vehicle in an area known for frequent drug trafficking, and observed during the afternoon, one man hand another an object in a clenched fist and then observed the other man hand the first some money, possess reasonable cause to stop the men, at least where the officers, based on experience, knew that the observed actions were consistent with a drug transaction. In contrast, the Louisiana Supreme Court has stated in dicta that
Three men gathered around a car parked at the curb in the 1800 block of Orleans Avenue near midnight, one of them reaching inside momentarily, provided little more than a "hunch" on the part of the officers that a drug transaction had taken place. Mere suspicious activity is not a sufficient basis for police interference with an individual's freedom.
State v. Williams, 421 So.2d 874, 876 (La. 1982) (citations omitted). Only when the fact that the trio suddenly departed when the officers arrived, that one suspect, while departing, put his hand to his mouth as if swallowing something, and that the driver of the vehicle attempted to depart were *1350 added to the scenario did reasonable cause to stop arise.
Additionally, the Louisiana Supreme Court has recognized and emphatically stated in State v. Hathaway, 411 So.2d 1074, 1079 (La.1982) that "Police officers can not actively create `street encounters' unless they have knowledge of suspicious facts and circumstances sufficient to allow them to infringe upon the suspect's right to be free from government interference. State v. Saia, 302 So.2d 869 (La.1974) [, cert. denied, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975)]."
ANALYSIS
In light of our constitutional restraints, statutory law, and our jurisprudential directives, we find the testimony surrounding the investigatory stop falls short of the Fourth Circuit holdings where a clear monied transaction was observedand somewhat short of the Williams situationin that Cuevas made no movement or gestures aimed at concealmentinsofar as indicia of criminal activity are concerned. Likewise, no money or objects were observed by the officers; we have before us only hand motions coupled with what we find to be a natural inclination to back away when being "swooped at," if you will, in an area known for drug activity. In the final analysis, from the viewpoint of the officers in viewing the scene immediately prior to the investigatory stop, we see no evidence of a crime just committed, being committed, or about to be committed. Accordingly, the trial court erred in its denial of the motion to suppress.
ERROR PATENT
La.C.Cr.P. art. 920 provides: "The following matters and no others shall be considered on appeal: (1) An error designated in the assignment of errors; and (2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." For the purpose of an error patent review, the "record" in the criminal case includes the caption, the time and place of holding court, the indictment or information and the endorsement thereon, the arraignment, the plea of the accused, the bill of particulars filed in connection with a short form indictment or information, and mentioning of the impaneling of the jury, the minute entry reflecting sequestration in a capital case, the verdict, and the judgment or sentence. State v. Oliveaux, 312 So.2d 337, 339 (La.1975); State v. Williams, 515 So.2d 1117, 1119 (La.App. 5th Cir.1987).
Upon our review of the record, we see no written judgment of the disposition signed by the court, although there is a commitment signed by the trial judge. This issue was addressed by our Circuit in State v. Jones, 517 So.2d 402 (La.App. 5th Cir.1987), which held that failure of the court to render a written judgment is a fatal defect in the proceedings. See also State v. Jennings, 478 So.2d 913 (La.App. 5th Cir.1985). In light of the signed commitment, we clarify that the policy of this Circuit is that a commitment signed by the trial judge constitutes a judgment of the trial court. Ergo, no error patent appears.
For the reasons assigned, the trial court erred in failing to suppress the evidence seized and, accordingly, we hereby reverse that ruling. We also set aside the conviction of the defendant.
REVERSED AND SET ASIDE.
GAUDIN, Judge, dissenting.
I believe the motion to suppress was properly denied and that Jose I. Cuevas was legally convicted. I would affirm.